UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
WILLIAM DuBUSKE, MICHAEL  :
DUCHAINE, and GARY MAYNARD, on :
behalf of themselves and all others similarly :
situated, :
                Plaintiff, :
v. : **OPINION AND ORDER**
: 18 CV 11618 (VB)
PEPSICO, INC., THE EMPLOYEE :
BENEFITS BOARD, THE PEPSICO :
ADMINISTRATION COMMITTEE, and :
JOHN/JANE DOES ##1–50, :
                Defendants. :
--------------------------------------------------------------x

Briccetti, J.:

        Plaintiffs William DuBuske, Michael Duchaine, and Gary Maynard bring this putative class action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. §§ 1001 et seq.), against defendants PepsiCo, Inc. ("Pepsi"), Pepsi's Employee Benefits Board (the "EBB"), Pepsi's Administration Committee (the "PAC"), and fifty unknown individuals sued as John or Jane Does.

        Now pending is defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6). (Doc. #21).

        For the reasons set forth below, the motion is GRANTED.

        The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

        For the purpose of ruling on the motion to dismiss, the Court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in plaintiffs' favor, as summarized below.

1

This case concerns plaintiffs' early retirement benefits under Pepsi's Salaried Employees Retirement Plan (the "plan"). Each plaintiff allegedly retired after working for Pepsi, or a Pepsi subsidiary or affiliate, for at least ten years.

According to the complaint, the plan is a defined benefit plan subject to ERISA. This means plan participants receiving a pension get "a certain annual amount that the plan pays during the employee's lifetime, beginning at the employee's retirement." Retirement Comm. of DAK Ams. LLC v. Brewer, 867 F.3d 471, 476 (4th Cir. 2017) (citing 29 U.S.C. § 1002(35)). The plan is administered by Pepsi and the PAC. The EBB allegedly appoints the PAC's members.

Plaintiffs say Pepsi employees participating in the plan can receive a monthly post-retirement pension starting at age 65, which the plan defines as its normal retirement age. Alternatively, participants can receive early retirement benefits if they retire before turning 65. In their papers opposing the instant motion, plaintiffs concede they took early retirement. (See Doc. #36 ("Pls' Sur-Reply") at 1–2).

For unmarried plan participants, the normal—i.e., the default—form of benefit under the plan allegedly is a single life annuity ("SLA"). An SLA is a stream of monthly payments that starts when the participant retires and ends when the participant dies. The amount of a participant's monthly SLA payments allegedly depends on the participant's wages at and "years of service with Pepsi." (Doc. #1 ("Compl.") ¶ 2).

For married plan participants, the normal form of benefit under the plan allegedly is a 50 percent qualified joint and survivor annuity ("QJSA"). A joint and survivor annuity ("JSA") is a stream of monthly payments that starts when the participant retires and, if the participant dies before his or her spouse, continues with monthly payments to the spouse until the spouse's death.

2

A "50 percent" JSA means that the monthly benefit paid to the participant's surviving spouse is 50 percent of the monthly benefit the participant received during his or her life under the plan. A QJSA is a JSA that satisfies certain statutory requirements.

Pursuant to the plan's terms, participants may elect to receive another, alternate form of benefit instead of an SLA or a QJSA. The complaint identifies these options as falling under one of two categories: qualified optional survivor annuities ("QOSA"), and qualified preretirement survivor annuities ("QPSA"). These categories come in different flavors. Further details are immaterial for present purposes.

If a participant chooses to receive a survivor annuity calling for potential payments to the participant's spouse—i.e., a QJSA, QOSA, or QPSA—the participant gets less money each month than if he or she chose to receive an SLA. This makes sense: a participant can choose to set money aside for his or her spouse after the participant dies, but doing so leaves less for the participant while he or she is still alive.

Plan administrators must therefore calculate how much to pay each month to a participant who chooses to receive a QJSA, QOSA, or QPSA. ERISA requires that such calculations yield a QJSA, QOSA, or QPSA that "is the actuarial equivalent of" the participant's SLA. See 29 U.S.C. §§ 1055(d)(1)(B), (d)(2)(A), (e)(1)(A).[1] In plain English, all the options in the alphabet soup of benefits from which a plan participant may choose must, at the end of the day, be worth the same as the participant's SLA.

The details are as follows. Actuarial equivalence depends on present value. According to the complaint, an annuity's present value has "two main components": (i) an interest rate—

---

[1] More precisely, a QPSA must make payments to a participant's surviving spouse that are either (i) at least as much as the spouse's payments would be under the plan's QJSA, or (ii) "the actuarial equivalent thereof." 29 U.S.C. § 1055(e)(1)(A).

which allegedly "should be based on prevailing market conditions"—and (ii) the participant's life expectancy, as listed in a grim spreadsheet called a "mortality table," which predicts when someone of a given age is most likely to die. (Compl. ¶ 43). To calculate an annuity's present value, one takes the applicable interest rate and the expected number of years the participant has left to live, and plug them (along with a few other numbers) into a formula.

Plaintiffs say the standard way of calculating a participant's QJSA, QOSA, or QPSA benefit—which, to reiterate, is lower than the participant's SLA benefit would be, because the participant has chosen to set some money aside for his or her surviving spouse—calls for "compar[ing] in a ratio" the present value of the participant's SLA on the one hand, and the present value of the participant's QJSA, QOSA, or QPSA on the other. (Compl. ¶ 44). The ratio allegedly generates a "conversion factor," also known as an "annuity factor"—0.8, say, or 0.75. (Id.). To calculate the size of a participant's QJSA, QOSA, or QPSA benefit, the participant's SLA benefit is multiplied by the conversion factor.

Plaintiffs claim defendants do not follow this allegedly standard method of calculating conversion factors. Instead, plaintiffs say defendants "baldly" set a fixed conversion factor for each form of alternative benefit, and then apply those conversion factors to all participants alike—no matter the prevailing interest rate of the day, and no matter the participant's life expectancy. (Compl. ¶ 45).

Plaintiffs allege these fixed conversion factors yield QJSAs, QOSAs, and QPSAs with lower present values than the SLAs that were "available" to plaintiffs "at early retirement." (Pls' Sur-Reply at 1). Thus, plan participants who retire early and choose a QJSA, QOSA, or QPSA allegedly end up worse off than if defendants calculated conversion factors in the purportedly standard fashion, "using reasonable market interest rates and mortality tables." (Compl. ¶ 46).

4

For example, "[u]sing the unreasonably low conversion factor instead of a conversion factor based on current mortality and interest rates [allegedly] reduces the monthly benefit by nearly 3% for a 50% joint and survivor annuity and by nearly 8% for a 100% joint and survivor annuity." (Id. ¶ 47).

Plaintiffs cry foul. They claim the conversion factors in question deprive them of benefits to which they are entitled, in contravention of ERISA's anti-forfeiture provision.[2] Plaintiffs plead two counts seeking equitable relief to remedy that alleged violation. They also plead a third count seeking equitable relief on a theory of breach of fiduciary duty.

## DISCUSSION

I.  Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).[3] First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

---

[2] As described in greater detail below, ERISA's anti-forfeiture provision renders "nonforfeitable" certain plan participants' vested right to receive certain benefits. 29 U.S.C. § 1053(a).

[3] Unless otherwise indicated, case quotations omit all citations, internal quotation marks, footnotes, and alterations.

5

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

II.     This Is an ERISA Case

Defendants first contend plaintiffs' claims fail as a matter of law because they do not arise under ERISA, but rather arise under federal regulations from which no private right of action derives.

Defendants are wrong.

The complaint plainly pleads claims under ERISA, not regulations promulgated thereunder. As plaintiffs' opposition brief explains, the complaint's citations to regulations interpreting ERISA do not mean plaintiffs rely on those regulations, rather than ERISA, as the legal basis for their causes of action. See Smith v. U.S. Bancorp, 2019 WL 2644204, at *2 (D. Minn. June 27, 2019). To the contrary, the complaint explicitly accuses defendants of violating ERISA in various ways. (See Compl. ¶¶ 61, 65, 76).

Thus, plaintiffs' claims arise under ERISA.

III.    Forfeiture Claims

Defendants argue plaintiffs fail plausibly to allege a violation of ERISA's anti-forfeiture provision, ERISA Section 203(a), 29 U.S.C. § 1053(a), because the provision applies only to normal retirement benefits upon the attainment of normal retirement age.

6

The Court agrees.

The anti-forfeiture provision provides, in pertinent part:

Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.

> (1) A plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.
>
> (2)(A)(i) In the case of a defined benefit plan, a plan satisfies the requirements of this paragraph if it satisfies the requirements of clause (ii) or (iii).
>
>> (ii) A plan satisfies the requirements of this clause if an employee who has completed at least 5 years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions.
>>
>> (iii) [Omitted].

29 U.S.C. § 1053(a). Thus, the provision applies to a participant's "normal retirement benefit . . . upon the attainment of normal retirement age." Id. And, "in addition," a defined benefit plan must satisfy two other requirements, both of which reference a participant's "nonforfeitable right" under certain circumstances to a portion of the participant's "accrued benefit" under the plan. Id. §§ 1053(a)(1)–(2)(A).

The complaint does not allege any plaintiff was deprived of "his normal retirement benefit . . . upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). First, "nonforfeitability attaches only after the employee attains normal retirement age." Estate of Balli v. Plumbers, Pipe Fitters & MES Local Union No. 392 Pension Fund, 2019 WL 2233347, at *4 (S.D. Ohio May 23, 2019). The anti-forfeiture provision thus "gives [a] Plaintiff no vested right to receive benefits until he reaches" normal retirement age. Gonzalez v. Local 553 Pension Fund, 2017 WL 3242329, at *5 (S.D.N.Y. July 28, 2017) (citing cases). No plaintiff allegedly

7

reached the plan's normal retirement age. Accordingly, plaintiffs do not adequately plead that the anti-forfeiture provision applies.

Second, the anti-forfeiture provision's references to certain participants' "accrued benefit," 29 U.S.C. §§ 1053(a)(1)–(2)(A), do not revive plaintiffs' claims. ERISA provides that a defined benefit plan's "accrued benefit" is "expressed in the form of an annual benefit commencing at normal retirement age." Laurent v. PricewaterhouseCoopers LLP, 794 F.3d 272, 274 (2d Cir. 2015) (quoting 29 U.S.C. § 1002(23)(A)). To translate, "this means that an employee's accrued benefit is the amount she would receive annually as an annuity <u>after she reaches normal retirement age</u>." <u>Id</u>. (emphasis added). Thus, "an accrued benefit is not the amount of pension payment a recipient receives by retiring early, it is the amount of pension payment a recipient achieves at normal retirement age." Engers v. AT&T, 2002 WL 32159586, at *8 (D.N.J. Oct. 17, 2002)).

Plaintiffs do not claim defendants have deprived plaintiffs of the full amount of pension payments they would achieve at normal retirement age. Instead, plaintiffs argue ERISA elsewhere imposes a separate and additional requirement "that the benefits Plaintiffs receive be no less valuable than the SLA they were offered when they <u>actually</u> retired."[4] (Pls' Sur-Reply at 1). But plaintiffs' first two causes of action allege "Defendants have violated ERISA's anti-forfeiture clause," not some other ERISA provision. (<u>See</u> Compl. ¶¶ 61, 65). The anti-forfeiture provision imposes no such requirement.

---

[4] This allegation distinguishes the instant case from <u>Smith v. U.S. Bancorp</u>, on which plaintiffs rely. <u>See</u> 2019 WL 2644204, at *1 ("Plaintiffs contend that the [factors in dispute] result in benefits that are not actuarially equivalent to the retirement benefit they <u>would have received at age 65</u>." (emphasis added)).

8

Accordingly, the Court dismisses Counts I and II of the complaint.[5]

IV. <u>Breach of Fiduciary Duty Claim</u>

The Court likewise dismisses plaintiffs' remaining claim for breach of fiduciary duty.

The complaint alleges defendants breached their fiduciary duty by countenancing the plan's use of "unreasonable conversion factors" that allegedly "resulted in participants and beneficiaries illegally forfeiting and losing vested benefits." (Compl. ¶ 74). As set forth above, plaintiffs have inadequately pleaded such a forfeiture. Their breach of fiduciary duty claim therefore fails as a matter of law.

**CONCLUSION**

The motion to dismiss is GRANTED.

The Clerk is directed to terminate the motion (Doc. #21) and close this case.

Dated: September 24, 2019
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

---

[5] Count II also invokes ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which authorizes a plan participant or beneficiary to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." (Compl. ¶ 67 (quoting 29 U.S.C. § 1132(a)(1)(B)). The complaint does not allege defendants have violated the plan's terms; rather, plaintiffs claim defendants have violated ERISA. Section 502(a)(1)(B) therefore does not independently give rise to a viable claim in this case.